REVISED – September 5, 2000

**UNITED STATES COURT OF APPEALS**
For the Fifth Circuit

---

**No. 97-31143**

---

ST. PAUL MERCURY INSURANCE CO.,

Plaintiff-Counter Defendants-Appellee,

VERSUS

ROBERT T. WILLIAMSON; SONYA WILLIAMSON; ARLONE BELAIRE,

Defendants-Counter Claimant-Appellants,

VERSUS

RICHARD VALE; HAYNES BEST WESTERN OF ALEXANDRIA, INC.; H. L. HAYNES; MRS. H. L. HAYNES; BEST WESTERN INTERNATIONAL, INC.; AMERICAN GENERAL FIRE AND CASUALTY CO.; MARYLAND CASUALTY CO.,

Counter Defendants-Appellees.

------------------------------------------------------

ROBERT T. WILLIAMSON; SONYA WILLIAMSON; ARLONE BELAIRE,

Plaintiffs-Appellants,

VERSUS

RICHARD VALE; ET AL.,

Defendants,

RICHARD VALE; HAYNES BEST WESTERN OF ALEXANDRIA; BEST WESTERN INTERNATIONAL, INC.; H. L. HAYNES; H. L. HAYNES; AMERICAN GENERAL

FIRE AND CASUALTY; MARYLAND CASUALTY CO.; ST. PAUL MERCURY
INSURANCE COMPANY; H.L. & H. HOLDING CO.;

Defendants-Appellees.

**************************************************

No. 98-30001

ST. PAUL MERCURY INSURANCE COMPANY,

Plaintiff-Appellant,

VERSUS

ROBERT T. WILLIAMSON; ET AL.,

Defendants,

ROBERT T. WILLIAMSON; ARLONE BELAIRE; SONYA J. WILLIAMSON,

Defendants-Appellees.

------------------------------------------------------

ROBERT T. WILLIAMSON; SONYA WILLIAMSON; ARLONE BELAIRE,

Plaintiffs-Appellees,

VERSUS

RICHARD VALE; ET AL.,

Defendants,

ST. PAUL MERCURY INSURANCE COMPANY

**Defendant-Appellant.**

*************************************************

─────────────────────

**No. 98-31243**

─────────────────────

**ST. PAUL MERCURY INSURANCE CO.; HAYNES BEST WESTERN OF
ALEXANDRIA, INC.; BEST WESTERN INTERNATIONAL, INC.; H. L.
HAYNES; H. L. HAYNES, Mrs.; H & L HOLDING CO.; AMERICAN
GENERAL INSURANCE CO.; RICHARD S. VALE; MARYLAND CASUALTY CO.,**

**Plaintiffs-Appellees,**

**VERSUS**

**SONYA WILLIAMSON, Individually and on behalf of her minor
children, ROBERT T. WILLIAMSON, Individually and on behalf
of his minor children; LAWRENCE J. SMITH,**

**Defendants-Appellants.**

─────────────────────

Appeals from the United States District Court
for the Western District of Louisiana

─────────────────────

August 17, 2000

Before JONES, DeMOSS and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

In these three consolidated appeals, we confront a convoluted set of facts and issues arising from the unfortunate litigiousness of the parties involved. Despite hopes that the cycle of litigation would end here today, we must conclude that the district court erred in various aspects of its rulings and that resolution

of these cases must await another time.

## I. BACKGROUND

In March of 1990, Sonya Williamson ("Sonya") individually and Robert Williamson ("Robert"), on behalf of their children, filed suit in state court against various individuals and entities including St. Paul Mercury Insurance Company ("St. Paul") (collectively the "insurance parties") for injuries suffered by Sonya at the Haynes Best Western of Alexandria. On September 26, 1994, the jury in this state case returned two findings: (1) Sonya had sustained injuries at the motel on July 21, 1989; and (2) the insurance parties had proved by a preponderance of the evidence that the incident of July 21, 1989, was a result of a staged accident or fraud. Judgment was entered in favor of the insurance parties. On January 29, 1997, the Louisiana Fourth Circuit Court of Appeal affirmed the jury's verdict. *See **Williamson v. Haynes Best Western***, 688 So. 2d 1201 (La. Ct. App. 1997). The Louisiana Supreme Court denied the Williamsons' applications for writs on June 20, 1997. *See **Williamson v. Haynes Best Western***, 695 So. 2d 1355 (La. 1997).

On November 4, 1993, during the pendency of the state trial, St. Paul filed suit in federal court against Robert, Arlone Belaire,[1] and Seahorse Farms (collectively with Sonya and with or

---

[1]Arlone Belaire is Robert Williamson's mother.

4

without Seahorse Farms as the "Williamsons"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and state law claims for fraud and conspiracy. St. Paul later amended the complaint on December 12, 1994, to include Sonya as a defendant. The complaint essentially alleged that the Williamsons have a lengthy history of making fraudulent insurance claims and that they staged the electrocution that supposedly injured Sonya at the motel.

On September 25, 1996, the Williamsons counterclaimed and simultaneously initiated an action in the same federal district court, which was ultimately consolidated with St. Paul's suit. They asserted various RICO and state law claims against the insurance parties. In general, their counterclaims alleged that the fraud defense asserted by the insurance parties in Sonya's state court personal injury trial, and which ultimately formed the basis for recovery in St. Paul's federal suit, was itself fraudulent.

On October 22, 1997, the district court granted summary judgment in favor of St. Paul and the other counter-defendants on the Williamsons' counterclaims. *See St. Paul Mercury Ins. Co. v. Williamson*, 986 F. Supp. 409 (W.D. La. 1997). It further dismissed St. Paul's RICO claims against the Williamsons on October 30, 1997.

Subsequent to the district court's dismissal of St. Paul's RICO claims, St. Paul orally dismissed Robert, Arlone, and Seahorse

5

Farms from the lawsuit at the final pretrial conference, held on October 31, 1997.  With those dismissals, the only remaining matters were St. Paul's state law claims for fraud and conspiracy against Sonya.  At the pretrial conference, the district court appeared to conclude that the state court jury finding of fraud was res judicata as to St. Paul's state law fraud claim.[2]  It induced Sonya's counsel to admit that with the dismissal of the other Williamson litigants, there existed the requirements for res judicata under Louisiana law.

Sonya's counsel, however, contended that the fraud and conspiracy claims had prescribed.  He was given the opportunity to file a motion for summary judgment on that issue, which he did on November 5, 1997.  St. Paul responded to that motion on November 7, 1997, six days prior to trial.  That response for the first time specifically mentioned a malicious prosecution claim.  Sonya filed a reply to the response on the same day.

On November 11, 1997, the district court denied Sonya's motion for summary judgment based on prescription.  But instead of addressing whether the fraud and conspiracy claims had prescribed, the district court's order focused on whether St. Paul's complaint provided Sonya with notice of the operative facts underlying a malicious prosecution claim.  While acknowledging that St. Paul did not expressly allege the legal theory of malicious prosecution, the

---

[2]But the district court reserved the right to make a final written ruling, which was never issued.

district court found that St. Paul's complaint gave adequate notice of that claim for purposes of Rule 8 of the Federal Rules of Civil Procedure.

Thereafter, on November 13, 1997, the district court ruled that the trial would proceed solely on the issue of damages. Sonya objected and asked for a continuance, which was denied. The jury returned a damages award against Sonya in the amount of $411,166.56.

While the federal suit was proceeding before the district court, Sonya and her children, through their father Robert, filed a petition in state court in November 1995, to nullify the prior state court judgment finding that Sonya's injuries were the result of a staged accident or fraud pursuant to Louisiana Code of Civil Procedure article 2004.[3] The petition alleged ill practices by the insurance parties in concealing the defects on the motel's premises and in presenting false testimony from motel employees regarding the condition and alteration of the electrical fixtures. The nullification case sat dormant during the pendency of the federal suit initiated by St. Paul. But in March of 1998, Sonya and the children filed a third supplemental and amending petition in state court, reviving the nullification suit.

---

[3]Article 2004 states that "[a] final judgment obtained by fraud or ill practices may be annulled."

7

On September 9, 1998, St. Paul and the other insurance parties filed a complaint in federal court to enjoin the nullification action. They argued that Sonya and the children's nullification petition was an attempt to relitigate the prior federal court judgment dismissing the Williamsons' counterclaims. Among the counterclaims had been allegations concerning the condition of the electrical fixtures and the insurance parties' representations of the motel's premises. A hearing was held on the injunction on October 5, 1998. On October 16, 1998, the district court preliminarily enjoined Sonya, Robert, their children, and their attorney Lawrence J. Smith, from pursuing the nullification action in state court, pending the resolution of the appeal of the federal case.

## II. DISCUSSION

In these consolidated appeals, the various parties raise an assortment of issues. In appeal No. 97-31143, the Williamson litigants challenge the district court's apparent directed verdict/summary judgment order concluding that the state court jury finding of fraud was res judicata as to the liability portion of St. Paul's malicious prosecution claim, its decision to strike all of Sonya's defenses to that malicious prosecution claim, the sufficiency of the evidence to support the jury's damages verdict, certain evidentiary rulings by the district court, and its summary

8

judgment order dismissing their counterclaims. In appeal No. 98-30001, St. Paul contests the district court's summary judgment order dismissing its RICO claims against the Williamsons. And in appeal No. 98-31243, Sonya, Robert, their children, and their attorney Smith assert that the district court erred in enjoining the nullification suit pending in Louisiana state court. We review each of these appeals in turn.

A.   Appeal No. 97-31143

In this appeal, one of Sonya's major contentions is that the district court improperly determined that the state court jury's finding of a staged accident or fraud was res judicata as to the liability portion of St. Paul's malicious prosecution claim. She offers both a procedural and a substantive reason for reversing the district court's ruling. Procedurally, she notes that the district court allowed St. Paul to proceed on the malicious prosecution theory despite that claim not having been explicitly stated in St. Paul's complaint. Moreover, it appeared to grant summary judgment sua sponte on the issue of liability without affording her a chance to respond. Substantively, Sonya maintains that the district court's grant of summary judgment misapplied Louisiana res judicata law.

9

St. Paul never specifically mentioned a malicious prosecution claim; that is, its complaint[4] did not include the magic words "malicious prosecution." Furthermore, St. Paul never moved to amend its complaint to include a malicious prosecution claim. Indeed, the first time St. Paul expressly asserted this claim was in its response to Sonya's motion for summary judgment.

The notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision. Rule 8 provides that "[a] pleading . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." The function of a complaint is to give the defendant fair notice of the plaintiff's claim and the grounds upon which the plaintiff relies. *See Doss v. South Cent. Bell Tel. Co.*, 834 F.2d 421, 424 (5th Cir. 1987) (citing *Conley v. Gibson*, 78 S. Ct. 99, 103 (1957)). The "form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981); *see also Doss*, 834 F.2d at 424.

---

[4]St. Paul actually filed more than one complaint in this case, but none of them specifically mentioned the malicious prosecution claim. For simplicity's sake, we use the singular.

Here, St. Paul's complaint focused on RICO violations purportedly committed by Sonya and the other Williamson litigants, but in describing those violations, it generally alleged that Sonya defrauded St. Paul by pursuing a fraudulent lawsuit in state court for which St. Paul sought damages to compensate for the attorneys' fees expended in that suit. Although those allegations did not specifically include the words "malicious prosecution," such a claim could conceivably come within those allegations, and those allegations state facts upon which relief can be granted.

Sonya's second procedural issue is of greater concern. St. Paul did not move for summary judgment based on res judicata as to the malicious prosecution claim, let alone on the fraud and conspiracy claims, which were the original claims that appeared to have been barred by res judicata at the October 31 pretrial conference. Hence, the district court must have sua sponte granted summary judgment on the liability portion of the malicious prosecution claim.

The district court may enter summary judgment sua sponte if the parties are provided with reasonable notice and an opportunity to present argument opposing the judgment. *See Ross v. University of Texas*, 139 F.3d 521, 527 (5th Cir. 1998). A party must be given at least ten days notice before a court grants summary judgment sua sponte. *See id.* (quoting *Miller v. Houghton,* 115 F.3d 348, 350 (5th Cir. 1997)). But failure to give notice may be harmless when

11

the "'nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact.'" *Id.* (quoting *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 504 (5th Cir. 1994)).

The record is unclear as to whether the district court gave notice to Sonya that it was considering an award of summary judgment on the malicious prosecution claim. We can either view the district court's statements at the October 31 pretrial conference as having provided notice, with the subsequent November 13 hearing reflecting the actual summary judgment ruling, or we can view the November 13 hearing as having been the first time that Sonya was notified about the possibility of summary judgment. In the former case, there would have been sufficient notice, while in the latter there would not have been. Part of the uncertainty stems from the district court's perception of the fraud and malicious prosecution claims as being virtually synonymous when it considered whether St. Paul's complaint alleged a malicious prosecution claim. Because the district court viewed the two claims similarly, it naturally assumed that its oral res judicata ruling as to the fraud claim at the October 31 pretrial conference was controlling. But the fact that St. Paul's complaint may have averred a malicious prosecution claim, in addition to the fraud claim, does not make the two claims the same. Hence, we conclude

12

that the November 13 hearing was the first notice to Sonya that the district court was considering summary judgment as to the liability portion of the malicious prosecution claim.

Notwithstanding this, summary judgment may still have been proper if the district court's procedural error was harmless. We, however, believe that that was not the case. Under Louisiana law, a malicious prosecution claim requires: 1) the commencement of an original criminal or civil judicial proceeding; 2) its legal causation by the present defendant against the present plaintiff who was the defendant in the original proceeding; 3) its bona fide termination in favor of the present plaintiff; 4) the absence of probable cause for such proceeding; 5) the presence of malice therein; and 6) damages conforming to legal standards resulting to the plaintiff. *See* **Hibernia Nat'l Bank v. Bolleter**, 390 So. 2d 842, 843 (La. 1980). Sonya's state court suit and the resulting jury verdict essentially established the first three elements. To determine if there was an absence of probable cause, we must examine whether Sonya had an honest and reasonable belief in the liability of St. Paul at the time that she filed her lawsuit. *See* **Jones v. Soileau**, 448 So. 2d 1268, 1272 (La. 1984). The mere fact that the state court jury found that the accident was staged or fraudulent did not conclusively establish that Sonya lacked probable cause to bring suit. *Cf.* **id.** (holding that a conviction or its reversal is not conclusive as to whether a defendant who

13

pressed criminal charges against the plaintiff had probable cause to bring forth the criminal complaint). Here, Sonya requested a continuance so that she could present the testimony of the attorneys who worked on her state court suit as to whether she had probable cause to pursue the lawsuit. Thus, Sonya had evidence that she wished to proffer to the court and that could have created a genuine issue of material fact as to the probable cause element. Therefore, we conclude that the district court should not have granted summary judgment sua sponte, and that irrespective of whether the district court complied with the notice requirements for summary judgment or committed harmless error, summary judgment based on res judicata was substantively improper.

The rules of res judicata encompass two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion. *See* ***Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.***, 575 F.2d 530, 535 (5th Cir. 1978). The former is typically what we call "res judicata," and it treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." *See* ***id.*** Res judicata incorporates the doctrines of merger and bar, thereby extending the effect of a judgment to the litigation of all issues relevant to the same claim between the same parties, whether or not those issues were raised at trial. Collateral estoppel precludes the relitigation of issues

14

actually adjudicated, and essential to the judgment, in a prior suit between the parties on a different cause of action. *See id.*

The Supreme Court has stated that "[t]he preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings 'shall have the same full faith and credit in every court within the United State . . . as they have by law or usage in the courts of such State . . . from which they are taken.'" *Marrese v. American Academy of Orthopaedic Surgeons*, 105 S. Ct. 1327, 1331-32 (1985) (quoting 28 U.S.C. § 1738). Under this statute, a federal court must refer to the preclusion law of the state in which judgment was rendered. *See id.* at 1332.

Here, the district court had to give the same preclusive effect to the Louisiana state court judgment as would a Louisiana court. But, because of its civilian heritage, Louisiana's preclusion law is quite different from that of its common law cousins. For example, Louisiana explicitly rejected collateral estoppel as a preclusive device until certain statutory revisions came into effect on January 1, 1991. *See B.E. Welch v. Crown Zellerbach Corp.*, 359 So. 2d 154, 156-57 (La. 1978); La. Rev. Stat. 13:4231. Consequently, the preclusive effect of judgments arising from suits filed before that date, such as the present matter, is determined by the law in effect prior to 1991. *See* La. Rev. Stat. 13:4231.

While Louisiana did not have collateral estoppel until 1991, it did codify a law of res judicata at former Louisiana Civil Code article 2286.[5]  That provision provided:

> The authority of the thing adjudged takes place only with respect to what was the object of the judgment.  The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties; and formed by them against each other in the same quality.

La. Civ. Code art. 2286.  Thus, for res judicata to have applied in the instant matter, there must have been: 1) an identity of the parties; 2) an identity of the thing demanded; and 3) an identity of the cause of action.  *See* ***Terrebonne v. Theriot***, 657 So. 2d 1358, 1361 (La. Ct. App. 1995).

When determining if res judicata applies, Louisiana courts have narrowly construed the doctrine's scope.  *See* ***B. E. Welch***, 359 So. 2d at 156.  Any doubt as to compliance with the requirements of res judicata is to be resolved in favor of maintaining the second action.  *See* ***Greer v. Louisiana***, 616 So. 2d 811, 815 (La. Ct. App. 1993).  And the party urging res judicata has the burden of proving each essential element by a preponderance of the evidence.  *See* ***id.***

Under Louisiana law, identity of the parties does not mean that the parties must be the same physical or material parties, but they must appear in the suit in the same quality or capacity.  *See*

---

[5]Article 2286 was redesignated as La. Rev. Stat. 13:4231 without change in substance by 1984 La. Acts 331, § 7, effective January 1, 1985.

16

*id.*  Here, that requirement was satisfied as Sonya and St. Paul opposed each other in both the state and federal suits in the same quality or capacity.  On the other hand, we encounter difficulties in establishing the second and third requirements.

The thing demanded has routinely been defined as the kind of relief sought.  *See* **Cantrelle Fence & Supply Co. v. Allstate Ins. Co.**, 515 So. 2d 1074, 1078 (La. 1987).  In reality, that requirement is more complicated as it encompasses the fundamental nature of the right claimed.  "[T]he thing demanded in any action is the recognition of the parties' rights vis-à-vis the thing in controversy."  David L. Hoskins, Comment, *Litigation Preclusion in Louisiana*: Welch v. Crown Zellerbach Corporation *and the Death of Collateral Estoppel*, 53 Tul. L. Rev. 875, 880 n.41 (1979); *see also* Dennis K. Dolbear, Note, *The End of Collateral Estoppel in Louisiana*: Welch v. Crown Zellerbach Corporation, 40 La. L. Rev. 246, 249 (1979) ("[I]t is the type of relief demanded, but viewed in terms of the basis for the right of indemnification.").  In the state court suit, St. Paul sought a defense verdict so that it would not have to pay any damages to Sonya for her injuries.  The thing in controversy was whether Sonya had suffered any injuries from the electrical accident and whether that accident had been fraudulent or staged.  In the federal case, what St. Paul wanted was damages for the attorneys' fees expended in fighting a maliciously prosecuted state suit.  Although the issue of fraud

17

played an important role in the federal suit, the relief sought in that suit vis-à-vis the malicious prosecution claim was palpably different from the relief requested in the state suit.

As for the third requirement of identity of cause of action, Louisiana courts have concluded that the phrase is a mistranslation of the French and that it really refers to the civil concept of cause. *See* **Greer**, 616 So. 2d at 815. Cause is the juridical or material fact which is the basis for the right claimed or the defense pleaded. *See* **Mitchell v. Bertolla**, 340 So. 2d 287, 291 (La. 1976). It may be likened to grounds, theory of recovery, or the principle upon which a specific demand is grounded, and it is a narrower concept than the common law's cause of action. *See* **Cantrelle Fence**, 515 So. 2d at 1078; **Greer**, 616 So. 2d at 815.

We can distinguish between cause and cause of action by gauging their effects under res judicata. After final judgment, a cause of action includes all grounds in support of it, and together they merge into the judgment so that relitigation of the cause of action on different grounds is barred. *See* **Cantrelle Fence**, 515 So. 2d at 1078. But because cause is roughly analogous to theory of recovery, a second suit on a different ground is not precluded. As a result, with minor exceptions, Louisiana's law of res judicata does not recognize the common law "might have been pleaded" rule. *See* **id.**; Thomas E. Loehn, Comment, *Res Judicata: Cause vs. Common Law*, 22 Loy. L. Rev. 221, 230 (1976) ("The Louisiana courts have

18

judicially declared in effect that res judicata will only apply to those matters actually litigated and concluded and not to those that might have been urged.").

In the state suit, St. Paul defended against Sonya, contending that the accident was fraudulent. The cause concerned the defense, based on fraud, of a negligence suit initiated by Sonya. That suit ultimately resulted in a jury finding that the accident was either staged or a fraud. In the later federal suit, St. Paul asserted a malicious prosecution claim, a theory of recovery that is wholly different than a fraud defense. There, the cause involved whether Sonya maliciously prosecuted her negligence suit against St. Paul. As previously noted, a malicious prosecution claim requires: (1) the commencement of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against the present plaintiff who was the defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damages conforming to legal standards resulting to the plaintiff. *See **Hibernia Nat'l Bank**, 390 So. 2d at 843. On the other hand, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." **Williamson**, 688 So. 2d at 1239 (citing La. Civ. Code Ann. art. 1953). To prove fraud,

19

one must show: 1) an intent to defraud, and 2) actual or potential loss or damages. *See **id.*** A comparison of those two theories of recovery reveals that the specific elements for a malicious prosecution claim do not coincide with those for fraud. Moreover, a malicious prosecution claim could not have proceeded at the same time that the state court trial on negligence and fraud was occurring.

Despite those differences, the district court found that the state court fraud finding established all the elements of the malicious prosecution claim.[6] The first three elements were satisfied when the first trial terminated in favor of St. Paul. The district court then held that the finding of fraud demonstrated a lack of probable cause, citing to ***Jones v. Soileau***, 448 So.2d 1268 (La. 1984). Because there was a lack of probable cause, the district court ruled that the presence of malice was established. *See **Hibernia Nat'l Bank***, 390 So. 2d at 844. Lastly, the district court said damages are presumed when all the other elements of a malicious prosecution claim are satisfied. *See **id.***

We believe that the ruling was in error. First, as previously noted, a fraud claim and a malicious prosecution claim are

_____

[6] The district court noted this in its Memorandum Order of November 11, 1997, denying Sonya's motion for summary judgment seeking dismissal of St. Paul's state law claims. In concluding that St. Paul had stated a claim for malicious prosecution in its pleadings, that order discussed in some detail how the state court fraud finding mirrored a malicious prosecution claim.

dissimilar in their elements and do not involve the same cause in the present case. The argument that a fraud finding establishes all the elements of a malicious prosecution claim and, therefore, is res judicata on that claim implies that the trial on the issue of fraud encompassed the malicious prosecution claim. This defies logic as a malicious prosecution claim could not have been tried until the first trial was over. Thus, there is an inherent contradiction to the notion that a fraud finding establishes all the elements for malicious prosecution and is res judicata on that claim. Second, what the district court did by treating the state court fraud finding as res judicata on the malicious prosecution claim was to use that finding in a manner akin to offensive collateral estoppel, incorporating the prior adjudication into the subsequent case to shorten the litigation. Res judicata, though, is typically a defensive doctrine, and Louisiana did not have collateral estoppel until 1991. Finally, the district court misread and misapplied the holding of *Jones* to support its proposition that a fraud finding establishes lack of probable cause as a matter of law. That case does not state such a holding but actually suggests that a fraud finding in a prior case is not conclusive as to the lack of probable cause. Hence, a fraud finding could not have conclusively established a malicious prosecution claim, and the former should not have been used as res

judicata as to the latter claim.[7]  Accordingly, we vacate the summary judgment and damages verdict in favor of St. Paul on its malicious prosecution claim.

In light of our reversal and vacatur, we decline to address Sonya's arguments as to the striking of her defenses or as to whether sufficient evidence supported the jury's damages verdict. As for the remaining issues on appeal in No. 97-31143, after having reviewed the briefs and the record in this case, we find them meritless.  Thus, we believe that the district court did not improperly grant summary judgment dismissing the Williamsons' counterclaims or err in its evidentiary rulings, and those determinations are affirmed.

B.  Appeal No. 98-30001

The second of the three appeals concerns the district court's summary judgment order dismissing St. Paul's RICO claims against the Williamsons.  RICO creates a civil cause of action for "'[a]ny person injured in his business or property by reason of a violation of section 1962.'"  *Beck v. Prupis*, 120 S. Ct. 1608, 1611 (2000) (quoting 18 U.S.C. § 1964(c)).  Here, St. Paul asserted violations of § 1962(a), (c), and (d).  We have reduced those subsections to

---

[7]Furthermore, the state court jury found that the accident had been staged or was fraudulent, not that Sonya had specifically committed fraud.  Without an examination of the state court record, we cannot say that such a general finding of fraud could properly be res judicata as to claims alleging individually specific charges of fraud or malicious prosecution.

22

their simplest terms to mean that:

> (a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;
> . . .
> (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and
> (d) a person cannot conspire to violate subsections (a), (b), or (c).

*See* **Crowe v. Henry**, 43 F.3d 198, 203 (5th Cir. 1995). Under all those subsections, to state a RICO claim, there must be: "(1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise*." **Delta Truck & Tractor, Inc. v. J.I. Case Co.**, 855 F.2d 241, 242 (5th Cir. 1988). Assuming that the three elements of a RICO person, a pattern of racketeering activity, and a RICO enterprise are met, we may then continue to the substantive requirements of each respective subsection.

Before proceeding to the three RICO elements and the substantive requirements of the subsections, we initially address St. Paul's argument as to the appropriate standard of review. Although the district court made its ruling after the Williamsons moved for partial summary judgment, St. Paul argues that the district court's ruling was based solely on the pleadings and that, therefore, the proper standard of review should be that for a

23

motion to dismiss as opposed to a motion for summary judgment.[8] If we were to review the appeal under a motion to dismiss standard, St. Paul particularly believes that it asserted sufficient allegations of injury caused by the Williamsons' use of racketeering income to maintain and operate a RICO enterprise in violation of § 1962(a).

When a party moves for summary judgment, as the Williamsons did in this case, "[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993). "'[B]efore the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial.'" *Id.* (quoting *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991)). Indeed, where a motion for summary judgment is solely based on the pleadings or only challenges the sufficiency of the plaintiff's pleadings, then such a motion should be evaluated in much the same way as a Rule 12(b)(6) motion to dismiss. *See id.* at 544.

---

[8]We review both a motion to dismiss and a motion for summary judgment under a de novo standard of review. In the former, the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *See Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). In the latter, we go beyond the pleadings to determine whether there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

Contrary to St. Paul's assertions, the Williamsons did proffer evidence in support of their motion for summary judgment. In addition to pointing out the lack of evidence supporting St. Paul's RICO claims, they offered affidavits, depositions, and other relevant documentary evidence suggesting that their prior insurance claims, which St. Paul alleged were some of the bases for the income that supposedly was invested into a RICO enterprise, were not fraudulent and could not be predicate acts for the pattern of racketeering needed for a RICO violation.

On the other hand, St. Paul contends that the Williamsons, as movants, failed to comply with the holding in *Ashe* because they did not offer evidence to show that there was an absence of proof as to the factual issue of whether there was investment into a RICO enterprise. Admittedly, the thrust of the submitted evidence related to the pattern of racketeering issue, and not the specific issue of investment in a RICO enterprise.

But the fact that the Williamsons raised the absence of a pattern of racketeering issue in the summary judgment motion and provided evidence to corroborate that argument necessarily supports the Williamsons' other argument that there was no evidence of investment in a RICO enterprise. Thus, the Williamsons, in their motion for summary judgment, did not rest on conclusionary statements but demonstrated that no factual issues warranted trial. In light of the Williamsons' satisfaction of their burden to

25

demonstrate that no factual issues existed and the district court's conscious decision to go beyond the pleadings, we review the current appeal under the de novo standard accorded to motions for summary judgment.

With that standard in mind, we turn to the substance of the district court's summary judgment order and St. Paul's appeal. Of the three elements required of any RICO claim, the district court noted that the Williamsons in their summary judgment motion had not challenged whether St. Paul had asserted and/or provided evidence of a RICO person or a RICO enterprise. A RICO person is the defendant, while a RICO enterprise can be either a legal entity or an association-in-fact. *See* **Crowe v. Henry**, 43 F.3d 198, 204 (5th Cir. 1995). If the alleged enterprise is an association-in-fact, the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure. *See* **Elliott v. Foufas**, 867 F.2d 877, 881 (5th Cir. 1989). Here, St. Paul had identified Robert, Sonya, and Arlone as defendants and had pleaded, and apparently established, the RICO enterprise as Seahorse Farms, and/or an association-in-fact of Robert, Sonya, and Arlone, and/or an association-in-fact of Robert, Sonya, Arlone, and Seahorse Farms.

The Williamsons, however, did circuitously challenge the third element of a pattern of racketeering activity, contending that St.

26

Paul had failed to show evidence of fraudulent insurance claims. A pattern of racketeering activity requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity. *See* **Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer**, 90 F.3d 118, 122 (5th Cir. 1996). By arguing that there were no fraudulent insurance claims, the Williamsons essentially challenged St. Paul's allegations of mail and wire fraud, the predicate acts asserted by St. Paul as the basis for a pattern of racketeering activity. Among other things, both RICO mail and wire fraud require evidence of intent to defraud, i.e., evidence of a scheme to defraud by false or fraudulent representations. *See* **Crowe v. Henry**, 115 F.3d 294, 297 (5th Cir. 1997). After reviewing the pleadings and the evidence, the district court determined that there were genuine issues of material fact as to the existence of a scheme to defraud and, as a result, as to the existence of those predicate offenses.

Despite finding in favor of St. Paul on the three common elements of a RICO claim, the district court found summary judgment proper because St. Paul had failed to meet the substantive requirements of § 1962(a), (c), and (d). We review each of those subsections in turn.

1. *Section 1962(a)*

To establish a § 1962(a) violation, a plaintiff must prove 1)

27

the existence of an enterprise, 2) the defendant's derivation of income from a pattern of racketeering activity, and 3) the use of any part of that income in acquiring an interest in or operating the enterprise. *Cf*. **United States v. Cauble**, 706 F.2d 1322, 1331 (5th Cir. 1983) (reciting elements for a § 1962(a) criminal violation). Moreover, there must be a nexus between the claimed violation and the plaintiff's injury. *See* **Crowe v. Henry**, 43 F.3d 198, 205 (5th Cir. 1995). In other words, for a viable § 1962(a) claim, any injury must flow from the use or investment of racketeering income. *See* **Parker & Parsley Petroleum Co. v. Dresser Indus.**, 972 F.2d 580, 584 (5th Cir. 1992).

Here, the district court dismissed St. Paul's claim because St. Paul failed to show that income from a pattern of racketeering activity was invested in or used to operate a RICO enterprise. The only predicate acts to form the basis of a pattern of racketeering activity were several counts of mail and wire fraud, which St. Paul explicitly stated in its complaint and RICO case statement.[9] From those specific predicate acts, the district court found that the

---

[9]St. Paul contends that other predicate acts were stated in the complaint and the RICO case statement and that evidence was submitted, in the form of admissions, which revealed that income from those acts were received by the Williamsons or Seahorse Farms. Although both the complaint and the RICO case statement do refer generally to some comments about insurance fraud claims by the Williamsons, the complaint and the RICO case statement clearly state and list the predicate acts of mail and wire fraud from which the RICO claims emanate. All of them concern acts occurring between March 29, 1989, and October 22, 1993.

28

only evidence of income was several checks from Insurance Company of North America ("CIGNA"). The district court ruled that the evidence did not establish that any of those checks were invested in or used to operate a RICO enterprise. It stated that St. Paul's unsubstantiated allegation that income from the predicate acts maintained the Williamsons during the prosecution of the state tort suit was insufficient to prove investment into a RICO enterprise. Although some evidence existed showing investment into the alleged RICO enterprise of Seahorse Farms, that investment was derived from income attributed to acts that were not alleged to have been predicate acts forming a pattern of racketeering activity.

On appeal, St. Paul primarily presses the sufficiency of its § 1962(a) allegations, based on the motion to dismiss argument that we previously noted as unavailing. The initial brief devotes very little to the district court's conclusion that there was no genuine issue of material fact as to the investment of racketeering income, in the form of the CIGNA checks, into a RICO enterprise. It merely alludes to some evidence indicating that the Williamsons' lacked legitimate income, and therefore, any income derived from a pattern of racketeering activity had to have been invested into the Williamsons' RICO enterprise, purportedly the association-in-fact of Sonya, Robert, and Arlone, in the form of support and maintenance so that the enterprise could pursue the state tort suit against St. Paul. And other than general assertions that the

29

complaint adequately alleges the existence of income from a pattern of racketeering activity, the initial brief does not present an argument that there is evidence substantiating the existence of income, other than the CIGNA checks, that was derived from the predicate acts specifically listed in the complaint. Only in its reply brief does St. Paul directly address the district court's conclusion that the evidence only supports the CIGNA checks as having been generated from a pattern of racketeering activity. In that reply brief, St. Paul notes circumstantial evidence of several settlement checks from a disability insurer, Motors Insurance Corporation ("MIC"), which may have been derived from the predicate acts that were alleged in the complaint and that formed the basis of a pattern of racketeering activity.

By the time the CIGNA checks were sent out starting in 1991, Seahorse Farms had terminated as an entity. The only alleged RICO enterprise that the checks could have been invested in was the association-in-fact of Robert, Sonya, and Arlone. The district court, however, determined that St. Paul had failed to prove investment into a RICO enterprise, notwithstanding evidence suggesting that all three members of the association-in-fact had received the CIGNA checks. It was not persuaded by St. Paul's unsubstantiated allegation that the use of the CIGNA checks to maintain Robert, Sonya, and Arlone during the prosecution of the state tort suit was investment into an enterprise. That was error.

Although we recognize and, in a sense, sympathize with the district court's apparent belief that St. Paul should have provided evidence beyond mere allegations that the CIGNA checks helped support the members of an enterprise to demonstrate investment into a RICO enterprise for purposes of a § 1962(a) violation, this Circuit's precedent dictates that a plaintiff "need prove only that illegally derived funds flowed into the enterprise." *Cauble*, 706 F.2d at 1342; *cf. United States v. Vogt*, 910 F.2d 1184, 1199 & n.7 (4th Cir. 1990) (applying a broad definition of "use" and acknowledging as sound the government's contention that the depositing of funds into an enterprise constituted a use to operate in violation of § 1962(a)); *United States v. McNary*, 620 F.2d 621, 628 (7th Cir. 1980) (finding that § 1962(a) does not require direct or immediate use of illicit income). Assuming, as we must, that Robert, Sonya, and Arlone comprised the enterprise and that they received the CIGNA checks, we believe a genuine issue of material fact exists as to whether racketeering proceeds were invested in or used to operate a RICO enterprise.

Of course, to state a claim under § 1962(a), a plaintiff must also show that its injuries resulted from the investment or use of racketeering proceeds. *See Parker & Parsley Petroleum*, 972 F.2d at 584. Although the district court did not specifically consider that nexus requirement to rule on the Williamsons' motion for summary judgment, they did raise it in their motion. Because we

31

can affirm a summary judgment on grounds not relied on by the district court so long as those grounds were proposed or asserted in that court by the movant, *see **Johnson v. Sawyer***, 120 F.3d 1307, 1316 (5th Cir. 1997), we address that requirement. In its complaint, St. Paul asserted that income from a pattern of racketeering activity, arising from mail and wire fraud predicate acts related to certain insurance claims, was invested in or used to operate the Williamsons' RICO enterprise and that the income was then used to support the enterprise as the enterprise proceeded with a lawsuit against St. Paul, thereby resulting in St. Paul's injuries. Among the predicate acts alleged to form a pattern of racketeering activity were instances of conduct directly connected to the filing of the state tort suit, including the filing of that suit.

This is troubling, in light of St. Paul's other claims under § 1962(c) that it was essentially injured by the defendants' pattern of racketeering activity, i.e., the predicate acts.[10] In discussing the investment injury[11] requirement of § 1962(a), this Circuit, like virtually all the other circuits who have reviewed this issue, has intimated that such an injury cannot just flow from

---

[10]St. Paul also alleged that those predicate acts injured it by violating state fraud law.

[11]For simplicity's sake, we use the term "investment injury" to refer to an injury from the use or investment of racketeering income in a RICO enterprise.

the predicate acts themselves. *See Parker & Parsley Petroleum*, 972 F.2d at 584; *see also Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994); *Nuggest Hydroelec. L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 437–38 (9th Cir. 1992); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229–30 (D.C. Cir. 1991); *Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2d Cir. 1990); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1150 (10th Cir. 1989). *But see Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836–40 (4th Cir. 1990). That is, injuries due to predicate acts cannot form the basis of an investment injury for purposes of § 1962(a). We must ask whether the injuries were a result of the predicate acts or a result of the investment of racketeering proceeds into a RICO enterprise. Otherwise, "it would be difficult to understand why Congress enacted § 1962(a)." *Danielsen*, 941 F.2d at 1230. If allegations sufficient to base a § 1962(c) action meet all the requirements of a § 1962(a) allegation, then there is no real rationale for Congress having passed both. *See id.* Here, St. Paul has come close to improperly conflating § 1962(a) and (c), by asserting that those acts related to the filing and prosecution of the state tort suit were mail and wire fraud predicates and that they caused it injuries.

In its response to the Williamsons' motion for summary judgment and in its initial brief, however, St. Paul argues in a roundabout way that the investment injury it suffered was not from

33

the predicate acts related to the filing of the state tort suit, but rather from the predicate acts associated with the Williamsons' claims with other insurance companies.[12]  It maintains that its injuries are cognizable because they were the result of the Williamsons' investment of racketeering income from a prior pattern of racketeering activity.  *See* **Newmeyer v. Philatelic Leasing, Ltd.**, 888 F.2d 385, 396 (6th Cir. 1989).

In **Newmeyer**, the plaintiffs had placed some money into an investment plan dealing with stamps, which the defendants had marketed.  *See* **id.** at 386-91.  The plaintiffs' complaints alleged that the defendants had been acting in concert over a period of five years, defrauding hundreds of individuals, many of them prior to the plaintiffs' own deception.  *See* **id.** at 396.  In furtherance of their scheme, the defendants allegedly committed mail and wire fraud, which constituted a pattern of racketeering activity.  *See* **id.**  Based on those allegations, the Sixth Circuit found that the plaintiffs had made out a § 1962(a) claim.  *See* **id.**  It observed that if the allegations were true and if the defendants had used the income derived from earlier racketeering activity against other victims to establish and operate the alleged scam into which the plaintiffs placed their own money, then it was not impossible for

---

[12]We find this argument odd because, as previously noted, the district court did not discuss or base its summary judgment order on the investment injury requirement.

34

the plaintiffs to demonstrate a § 1962(a) injury. *See **id.***

The present situation closely parallels the **Newmeyer** case except that we encounter uncertainty as to whether St. Paul has alleged and established more than one pattern of racketeering activity. St. Paul's complaint grouped all the predicate acts together, implying that they composed one pattern of racketeering. In addition, of the predicate acts specifically listed in the complaint, almost all of them related to the Williamsons' actions to obtain monetary compensation from insurance claims arising out of Sonya's July 1989 electrocution. Indeed, the CIGNA checks that purportedly constitute the investment into the RICO enterprise were received as a result of Sonya's electrocution, the event that also spurred the Williamsons' predicate acts associated with the filing of the state court suit. The commonality in the source of those predicate acts suggests that the predicate acts that led to the CIGNA checks and the predicate acts connected to the filing of the lawsuit were related and formed one pattern of racketeering activity. If we were to discern only one pattern of racketeering

activity, then this case would not fit easily within the **Newmeyer** holding.[13]

Despite the problems, we believe that St. Paul has sufficiently distinguished and established a genuine issue of material fact as to the existence of a prior pattern of racketeering activity, which may have produced income that was invested into a RICO enterprise, causing injuries to St. Paul in the form of legal costs. Although St. Paul may have confusingly included those predicate acts that formed the prior pattern of racketeering activity with those predicate acts that injured St. Paul pursuant to § 1962(c), it is apparent from the complaint and other documents that St. Paul was asserting that it was injured by the investment of prior racketeering proceeds into the Williamsons' RICO enterprise. And while the CIGNA checks and the predicate acts related to the filing of the lawsuit all arose from Sonya's electrocution, that commonality does not mean that no § 1962(a) claim can be asserted. The CIGNA checks were procured as a result of Sonya's electrocution, but they dealt with racketeering activity connected to the Williamsons' actions with other insurance companies. The predicate acts associated with the filing of the

---

[13]Part of the problem also rests with St. Paul's failure to allege properly as predicate acts a host of allegations about the Williamsons's insurance claims from the early 1980s to 1989, which were purportedly a part of a prior pattern of racketeering activity. *See supra* note 9. If St. Paul had established those predicate acts, then the prior pattern of racketeering activity would have been much more evident.

lawsuit, which formed the basis of the pattern of racketeering activity under § 1962(c), concerned racketeering activity primarily related to the Williamsons' dealings with St. Paul. Thus, while the predicate acts connected to the CIGNA checks and to the filing of the lawsuit all sprang from the same root, those predicate acts were the bases of different patterns of racketeering activity. Hence, we find that St. Paul has asserted and created a genuine issue of material fact as to the existence of an investment injury. Accordingly, we vacate the district court's summary judgment in favor of the Williamsons' as to the § 1962(a) claim with respect to the CIGNA checks.

As for the income from the MIC settlement checks, which were received by the Williamsons and which St. Paul raises in its reply brief as evidence of other racketeering income having been invested into a RICO enterprise, we affirm the district court. Generally, we deem abandoned those issues not presented and argued in an appellant's initial brief, nor do we consider matters not presented to the trial court. *See* **Webb v. Investacorp Inc.**, 89 F.3d 252, 257 n.2 (5th Cir. 1996). In its initial brief, St. Paul tangentially referred to the Williamsons' receipt of disability checks in general, but any reference to those checks were in the context of its general allegations concerning the Williamsons' fraudulent RICO scheme. St. Paul did not challenge the district court's ruling that there was no genuine issue of material fact as to the lack of

37

racketeering income other than the CIGNA checks.  Likewise, St. Paul's response to the Williamsons' summary judgment motion was deficient with respect to any argument that there was evidence supporting the receipt of income, in the form of the MIC settlement checks, from a pattern of racketeering activity.[14]  Accordingly, we believe that St. Paul has abandoned any argument regarding the existence of evidence pertaining to income derived from a pattern of racketeering activity.

   2.   *Section 1962(c)*

As previously noted, § 1962(c) prohibits "any person employed by or associated with any enterprise" from participating in or conducting the affairs of that enterprise through a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c).  Like the overwhelming majority of our sister circuits, we have held that subsection (c) requires that the RICO person be distinct from the RICO enterprise. *See **Bishop v. Corbitt Marine Ways, Inc.**,* 802 F.2d 122, 122-23 (5th Cir. 1986) (collecting cases); *see also **Crowe**,* 43 F.3d at 206 ("[A] RICO person cannot employ or associate with himself under [§ 1962(c)]".); ***In re Burzynski**,* 989 F.2d at 743 (citing ***Bishop**).*  Here, St. Paul identified Robert, Sonya, and Arlone as defendants, and thus as RICO persons.  Moreover, it

---

[14]St. Paul submitted evidence of those checks, but it did not connect that evidence to any argument regarding the existence of income, in the form of those checks, derived from a pattern of racketeering activity.

alleged that the enterprise was essentially the association-in-fact of Robert, Sonya, and Arlone.

The district court viewed those allegations as failing to establish any distinction between the RICO defendants and the RICO enterprise, and it dismissed St. Paul's § 1962(c) claim. The two primary bases for the district court's determination were the *Burzynski* and *Crowe* decisions from this Circuit. In *Burzynski*, the plaintiff, a doctor who operated a research institute, sued Aetna Life Insurance Company ("Aetna"), a litigation consultant hired by Aetna, the company started by that litigation consultant, and Aetna's outside law firm for violating, among other things, § 1962(c). *See In re Burzynski*, 989 F.2d at 742. The plaintiff charged that the enterprise was an association-in-fact comprised of the defendants. *See id.* at 743. The *Burzynski* panel found that this contravened the person/enterprise distinction as required by § 1962(c) and by *Bishop*. *See id.* In *Crowe*, the plaintiff, Larry Crowe, sued his lawyer, Sam Henry, under the RICO statutes, including § 1962(c). *See Crowe*, 43 F.3d at 201. The RICO enterprise was allegedly an association-in-fact of Crowe and Henry. *See id.* at 206. Citing *Burzynski*, a different panel of this Court concluded that Crowe's claim failed to demonstrate a sufficient distinction between the person and the enterprise. *See id.*

39

St. Paul does not dispute the district court's reading of the *Burzynski* and *Crowe* holdings.  It concedes that those decisions seem to hold that members of an association-in-fact enterprise cannot also be RICO persons for purposes of a § 1962(c) claim.  But St. Paul responds that recent case law casts doubt on the validity of *Burzynski*'s and *Crowe*'s interpretation of the person/enterprise distinction and that those two cases actually conflict with earlier Fifth Circuit case law.  Referring to *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143 (5th Cir. 1997), St. Paul argues that there is a difference between the naming of a corporation as an alleged member of an association-in-fact enterprise and the naming of individuals as alleged members of an association-in-fact enterprise when determining the person/enterprise distinction.  In addition, St. Paul asserts that *Khurana* comports with even earlier circuit precedent, *United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978), which perceived the person/enterprise distinction differently than *Burzynski* and *Crowe*.

First off, we note that the Supreme Court vacated the judgment in *Khurana*.  *See Teel v. Khurana*, 119 S. Ct. 442 (1998).  Second, even if *Khurana* altered the landscape of the person/enterprise distinction in our circuit, we are bound to the holdings in *Burzynski* and *Crowe*, assuming that those are our earliest pronouncements on this issue.  *See United States v. Texas Tech Univ.*, 171 F.3d 279, 285 n.9 (5th Cir. 1999), *cert. denied*, 120 S.

40

Ct. 2194 (2000) (observing that when two prior panel decisions conflict, the first decision controls); *see also* **Luna v. United States Dep't of Health & Human Servs.**, 948 F.2d 169, 172 (5th Cir. 1991).

Nonetheless, reviewing **Elliott** and some of the other decisions that led to the **Burzynski** and **Crowe** decisions, we believe that St. Paul makes a meritorious argument. In **Elliott**, the government prosecuted six individuals for RICO violations.[15] *See* **Elliott**, 571 F.2d at 895. Those six individuals comprised the association-in-fact enterprise. *See* **id.** at 898 n.18. Of the six, two were charged as defendants for violating § 1962(c). *See* **id.** at 896. Notwithstanding the fact that both individuals charged with violating § 1962(c) were named as RICO persons and as members of the association-in-fact, the **Elliott** panel affirmed their convictions. *See* **id.** at 900.

Thus, when **Bishop**, the decision to which the **Burzynski** court cited for support, held that to state a § 1962(c) claim, a plaintiff had to distinguish between the RICO person and the RICO

---

[15]Although **Elliott** involved a criminal prosecution as opposed to a civil suit, the substantive requirements of § 1962(c) are the same. *Cf.* **Alcorn County v. U.S. Interstate Supplies, Inc.**, 731 F.2d 1160, 1170-71 (5th Cir. 1984), *abrogated on other grounds*, **United States v. Cooper**, 135 F.3d 960 (5th Cir. 1998) (construing criminal RICO cases as relevant for purposes of determining whether a violation occurred); *see also* **United States v. Shifman**, 124 F.3d 31, 35 n.1 (1st Cir. 1997) ("[I]t is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability.").

41

enterprise, it was not making the sweeping generalization that any congruence between a RICO person and a member of an association-in-fact, which constituted a RICO enterprise, violated the person/enterprise distinction. Instead, *Bishop* merely concurred with the vast majority of the circuits that held that a § 1962(c) claim requires a distinction between the RICO person and the RICO enterprise. Those circuits were discussing the person/enterprise distinction where the plaintiffs were alleging a corporate entity as both a RICO defendant and a RICO enterprise. *Bishop* itself involved a plaintiff who sought a § 1962(c) claim against a single corporate defendant, which was also named as the RICO enterprise. *See Bishop*, 802 F.2d at 122.

The reason for differentiating in the § 1962(c) context between cases where a corporation is identified as both the enterprise and the defendant and cases where it is not was aptly noted in the *Harocco* decision, to which *Bishop* heavily deferred. *See Harocco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 399 (7th Cir. 1984). The RICO statute distinguishes between a corporation and an association-in-fact with respect to the "person" element. *See id.* According to the *Haroco* court:

> Where persons associate "in fact" for criminal purposes, . . . each person may be held liable under RICO for his, her or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity. But the nebulous association in fact does not itself fall within the RICO definition of "person[]" . . .

42

. In the association in fact situation, each participant in the enterprise may be a "person" liable under RICO, but the association itself cannot be. By contrast, a corporation obviously qualifies as a "person" under RICO and may be subject to RICO liability.

*Id.* at 401. Thus, courts have routinely required a distinction when a corporation has been alleged as both a RICO defendant and a RICO enterprise, but a similar requirement has not been mandated when individuals have been named as defendants and as members of an association-in-fact RICO enterprise.[16]

Indeed, "'[a] collective entity is something more than the members of which it is comprised.'" *United States v. Fairchild*, 189 F.3d 769, 777 (8th Cir. 1999) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989)). "Although a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise. In such a case,

---

[16]To get around having a corporation named as both a RICO defendant and a RICO enterprise, many plaintiffs have charged the corporation as being part of an association-in-fact enterprise and also as a RICO defendant. Courts have roundly criticized this formulation. *See*, *e.g.*, *Brittingham v. Mobil Corp.*, 943 F.2d 297, 300-302 (3d Cir. 1991). In some ways, that formulation parallels the situation where individuals are named as defendants and as being part of an association-in-fact, and accordingly, the criticism has fed the notion that no defendant can be a part of the association-in-fact enterprise or it would violate the person/enterprise distinction. But the criticism pertaining to having corporations listed as being a part of the association-in-fact is due to the fact that a "§ 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation." *Id.*; *see also Old Time Enters. v. International Coffee Corp.*, 862 F.2d 1213, 1215 (5th Cir. 1989). The criticism is generally unwarranted where corporations are not involved.

43

the individual defendant is distinct from the organizational entity." *Id.* Otherwise, an individual member of a collective enterprise, such as an association-in-fact, could not be prosecuted for violating § 1962(c) because he or she would not be considered distinct from the enterprise. *See id.* Accordingly, we vacate the district court's award of summary judgment in favor of the Williamsons' on St. Paul's § 1962(c) claim.

3. *Section 1962(d)*

Under § 1962(d), a person cannot conspire to violate subsections (a) or (c). *See* 18 U.S.C. § 1962(d). With respect to a conspiracy to violate subsection (c), this Circuit has previously stated that just as a RICO person cannot employ or associate with itself, it cannot conspire to employ or associate with itself. *See* **Ashe**, 992 F.2d at 544. As a result, the district court dismissed the § 1962(d) claim based on an agreement to violate subsection (c) because it concluded that St. Paul had failed to distinguish the RICO persons from the RICO enterprise. But in light of our holding that St. Paul has established a distinction between the RICO persons and the RICO enterprise, we vacate the district court's ruling with respect to St. Paul's § 1962(d) claim charging a conspiracy to violate subsection (c). Moreover, we remand the case back to the district court so that it may address St. Paul's § 1962(d) claim based on an agreement to violate subsection (a),

44

which the district court failed to do in its order.[17]

C.   Appeal No. 98-31243

In the third and final consolidated appeal, we must determine whether the district court erred in enjoining Sonya, Robert, their children, and their agents from pursuing the state court nullification suit.  Under the Anti-Injunction Act, a federal court may not grant an injunction to stay proceedings in a state court "except as expressly authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Next Level Communications LP v. DSC Communications Corp.*, 179 F.3d 244, 249 (5th Cir. 1999).  These exceptions are narrowly construed.  *See id.*  The district court granted the injunction based on the exception to protect or effectuate its judgment, otherwise known as the relitigation exception.  That exception "`was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court.'"  *Id.* (quoting *Chick Kam Choo v. Exxon Corp.*, 108 S. Ct. 1684 (1988)).  Although generally the grant of a preliminary injunction is reviewed for abuse of discretion, we review the district court's application of the relitigation exception de novo.  *See Next Level*, 179 F.3d at 249.

To apply the exception, the parties to the original action

_____

[17]As we previously noted, St. Paul has established a genuine issue of material fact with respect to the § 1962(a) claim.

45

must have actually disputed the issue and the trier of fact must have actually resolved it. *See* **Santopadre v. Pelican Homestead & Sav. Ass'n**, 937 F.2d 268, 273 (5th Cir. 1991). In determining which issues have been actually litigated, the federal court is free to go beyond the judgment and may examine the pleadings and the evidence in the prior action. *See* **id.** If a question of fact is put in issue by the pleadings, is submitted to the jury or other trier of facts for its determination, and is determined, then that question of fact has been actually litigated. *See* **id.**

The state court nullification petition alleges that several acts committed by the insurance parties during the course of the state court negligence trial constituted ill practices within the meaning of article 2004. Among the acts were the nondisclosure of: (1) the identity of George Casellas, the insurance parties' non-testifying expert; (2) Casellas' photograph of the wall switch; (3) evidence indicating water migration from the second floor to Room 170; and (4) the replacement of the wall switch and lamp fixture in Room 170. Similar allegations were included as part of the Williamsons' RICO counterclaims in the federal suit. Indeed, attorney Smith conceded that the facts pertaining to the nullification suit were essentially the same as those involved in the RICO counterclaims. In the federal suit, the district court granted summary judgment dismissing the RICO counterclaims, finding: (1) that there was a lack of evidence showing an alleged

46

scheme by the insurance parties to present a fraudulent defense in the state negligence suit; (2) that the existence of certain photographs not revealing a cement slab between Rooms 170 and 270 did not confirm a scheme to defraud; (3) that any alleged alterations of the wall switch or the hanging lamp were not indicative of a scheme to defraud; (4) that the possible creation of a drain hole above Room 170 after Sonya's electrocution did not confirm a scheme to defraud; (5) that none of the evidence submitted by the Williamsons indicated that Sonya's electrocution could not have been staged or fraudulent; and (6) that an abundance of evidence pointed to the possibility of fraud by the Williamsons.

Article 2004 provides for the annulment of a final judgment obtained by fraud or ill practices. There are two criteria to determine that a judgment has been obtained by actionable fraud or ill practices: (1) the circumstances under which the judgment was rendered show the deprivation of legal rights of the litigant who seeks relief, and (2) the enforcement of the judgment would be unconscionable and inequitable. *See **Kem Search, Inc. v. Sheffield***, 434 So. 2d 1067, 1070 (La. 1983). In addition, article 2004 is "not limited to cases of actual fraud or intentional wrongdoing, but is sufficiently broad to encompass all situations wherein a judgment is rendered through some improper practice or procedure which operates, even innocently, to deprive the party cast in judgment of some legal right, and where the enforcement of the

47

judgment would be unconscionable and inequitable." *Id.*

The district court's findings clearly demonstrate that the court considered and adjudged the issue of fraud. But the amorphous and broad definition of ill practices suggests that the district court did not actually litigate an ultimate issue of fact that precludes the possibility of litigating the issue of ill practices and the corresponding nullification claim. Indeed, none of the findings say directly that the insurance parties' actions were not ill practices. Accordingly, those findings do not prevent the litigation of whether some of the alleged acts committed by the insurance parties were improper practices that operated, even innocently, to deprive the Williamsons some legal right.

The grant of summary judgment in favor of St. Paul on the counterclaims asserted by the Williamsons in the federal court proceeding for acts of RICO and fraud that allegedly occurred during the state court trial is sufficient to support an injunction by the federal court to prevent relitigation in the state court of "fraud" as a grounds for nullification of the original state court decision. But that summary judgment is insufficient to prevent relitigation of "ill practices" under the Louisiana statute. Consequently, we vacate the injunction issued by the district court and remand that injunctive relief to the district court for reissuance by the district court so as to be expressly limited to the fraud issue.

48

## CONCLUSION

Besides the procedural irregularity associated with the sua sponte grant of summary judgment, the jury finding that Sonya's injuries were the "result of a staged accident or fraud" does not, as a matter of law, satisfy all of the elements of a malicious prosecution claim. Therefore, the district court erred in applying Louisiana res judicata law to hold that Sonya was liable on the malicious prosecution theory. Accordingly, we vacate the judgment against Sonya and remand the malicious prosecution claim of St. Paul to the district court for trial on the merits. In addition, we affirm the district court's evidentiary rulings and the summary judgment dismissing the Williamsons' counterclaims.

As for St. Paul's RICO claims, we vacate and remand the following for proceedings consistent with this opinion: 1) the judgment in favor of the Williamsons with respect to St. Paul's § 1962(a) claim, insofar as it pertains to the CIGNA checks; 2) the judgment in favor of the Williamsons concerning the § 1962(c) claim; and 3) the judgment in favor of the Williamsons with respect to the § 1962(d) claim for conspiracy to violate § 1962(c). Furthermore, we remand to the district court for consideration St. Paul's § 1962(d) claim for conspiracy to violate § 1962(a).

Finally, we vacate the injunction issued by the district court

49

and remand that injunctive relief to the district court for reissuance by the district court so as to be expressly limited to the fraud issue.

All outstanding motions are denied.

EDITH H. JONES, dissenting:

I respectfully dissent. Despite the majority's exacting discussion of the issues that allegedly preclude affirming the trial court's judgment, I am unpersuaded on two conclusions in particular: that the jury finding of a staged or fraudulent action does not subsume the elements of malicious prosecution[1]; and that the injunction against litigation of the Williamsons' "ill practices" claim must be overturned.[2] The result of these twin rulings is to nullify the original verdict -- extraordinary as it is -- that Sonya's electrocution claim was staged or fraudulent.

Far worse, though, is the parties' abuse of the courts over the last decade. To stage an accident for insurance tribute is reprehensible. But it's also hard to see what good, or what collectable money judgment, may come of a RICO suit against these pathetic perpetrators. This litigation, like this dissent, should end!

---

[1]How is it possible to justify the majority's conclusion that, even though the electrocution accident was staged or fraudulent, there might have been probable cause to file Sonya's suit?

[2]The majority strains common sense, it seems to me, in holding that even though the insurers committed no fraud in defending Sonya's electrocution lawsuit -- which was started by a staged or fraudulent action of plaintiffs -- the insurers may have engaged in "ill practices" of litigation.